IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON

JAMES W. RICE,

   Plaintiff,

v.           CASE NO. 3:08-cv-01376

MICHAEL J. ASTRUE,
Commissioner of Social Security,

   Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  This case was referred to this United States Magistrate Judge by Clerk's Order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, James W. Rice (hereinafter referred to as "Claimant"), filed an application for DIB on July 13, 1993, alleging disability as of May 5, 1988, due to back pathology, left elbow biceps tear surgery residuals, allergies, hypertension, and depression.  (Tr. at 14-15, 22-24, 403.)  The claim was denied initially and upon reconsideration.  (Tr. at 14, 26.)  On June 7, 1994, Claimant requested a hearing before an Administrative Law

Judge ("ALJ").  (Tr. at 29.)  The hearing was held March 1, 1995 before the Honorable J. Alan Mackay.  (Tr. at 266-78.)  By decision dated March 27, 1996, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 14, 266-78.)  On March 9, 1000, the ALJ's decision was remanded to the ALJ by the Appeals Council because the file had been lost and had to be reconstructed.  (Tr. at 286-88.)

Subsequently, a hearing was scheduled on December 12, 2000, wherein Claimant appeared and testified before the Honorable Andrew J. Chwalibog.  (Tr. at 14.)  By decision dated February 12, 2002, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-21.)   The ALJ's Decision became the final decision of the Commissioner on May 24, 2002, when the Appeals Council denied Claimant's request for review.  (Tr. at 421-22.) The decision was appealed to the United States District Court for the Southern District of West Virginia.   On October 24, 2006, Robert C. Chambers, United States District Judge, remanded the case to the Commission for further proceedings, consistent with Magistrate Judge's findings and recommendations.  (Tr. at 423-26.) On March 24, 2007, the Appeals Council sent the case back to the ALJ. (Tr. at 427-29A.)   The Appeals Council stated:

> The original claim file has been lost.  Extensive efforts to reconstruct the file have not been fully successful:
>
> • At tr. 18, the February 2002 decision cited written evidence (prehearing interrogatories) from a medical expert.  The decision cited this evidence

as Exhibit 64. The reconstructed file does not extend past Exhibit 59, and does not include the cited medical expert evidence.

- The decision also cited a January 2001 post hearing consultative examination by a Dr. Barefoot, albeit without referring to an exhibit number. The reconstructed file does not include any report from Dr. Barefoot.

- In concluding that there were jobs existing in significant numbers, the decision referred to evidence from a vocational expert. It cited specific jobs. The reconstructed file does not include evidence from a vocational expert identifying the same specific jobs. The cited vocational evidence thus appears not to be part of the reconstructed file.

The claimant's case therefore requires further consideration. On remand the ALJ will:

- Update the evidence of record to the extent required under 20 CFR 404.1512-1513. The ALJ will offer the claimant and his representative an opportunity to submit evidence relevant to the period at issue.

- Determine under sequential evaluation whether the claimant was disabled during the period at issue (20 CFR 404.1520).

In compliance with the above, the ALJ will take any further action needed to complete the administrative record and issue a new decision.

(Tr. at 429-29A.)

By decision dated January 30, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 403-09.) Exceptions were filed on March 3, 2008. (Tr. at 397.) The ALJ's decision became the final decision of the Commissioner on September 27, 2008, when the Appeals Council denied Claimant's request for review. (Tr. at 393-96.) On November 30, 2008, Claimant brought the present action seeking judicial review of the administrative

3

decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v.

4

Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 405.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic lumbosacral strain, residuals from repair of a ruptured left biceps tendon, hypertension, and environmental allergies.  (Tr. at 405-06.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 406.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 406-08.)  As a result, Claimant cannot return

5

to his past relevant work.  (Tr. at 408.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as bench work laborer, assembler, and surveillance system monitor, which exist in significant numbers in the national economy.  (Tr. at 408-09.)  On this basis, benefits were denied.  (Tr. at 409.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner in this case is supported by substantial evidence.

Claimant's Background

Although Claimant elected not to testify at the supplemental administrative hearings, he was 57 years old at the time of the hearings.  (Tr. at 408, 463-69, 470-76.)  He has a high school education.  (Tr. at 408.)  In the past, he worked as a construction worker, heavy equipment operator and truck driver.  (Tr. at 408, 473.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence

On February 6, 1989, Claimant reportedly fell at work six months earlier, injuring his left arm, and requiring surgery at St. Mary's Hospital.  (Tr. at 49-53.)  Prior to surgery, Dan Carr, M.D. stated:

> Mr. Rice...has had persistent pain in his left arm for six months, post work injury and the distal biceps tendon was partially ruptured, continuing to go on and have further rupture of the tendon.  At this point, causes constant aching and discomfort in his arm with complaints of weakness.  He is unable to do the manual type labor that his arm requires.  He is otherwise in good health and has a history of hypertension on two antihypertension medications.

(Tr. at 52.)

Dr. Carr diagnosed Claimant with "[d]istal rupture biceps tendon, left elbow of left arm, chronic." (Tr. at 50.)  Dr. Carr's

7

operative findings were:

> A completely torn biceps tendon with the tendon sheath
> itself extremely attenuated.  The biceps tendon was
> curled up into the mass of the biceps and we were unable
> to dissect it free.  We therefore resected part of the
> biceps tendon and then after thoroughly immobilizing the
> biceps brought it down and re-attached it into the
> anterior humeral shaft after splitting the brachialis to
> form a more smooth cosmetic appearing arm.

(Id.)

Records indicate that Claimant continued to be treated by Dr.
Carr regarding his left elbow on May 19, 1989, June 23, 1989,
August 25, 1989, August 28, 1990, October 4, 1991, February 4,
1993, and March 18, 1993.  (Tr. at 67-73.)  The March 18, 1993 note
states:

> Follow up overuse syndrome, left elbow, chronic biceps
> tear.  He continues to have pain and problems with this.
> He has tried to go through Voc Rehab, and apparently
> there has been some problem with this, and there are many
> reasons for such.
>
> At this time I believe there are jobs that he can do at
> a light or sedentary level.  I believe he cannot go back
> to heavy labor or even medium level labor.  I would
> recommend a physical therapy program and range of motion.
> I would recommend Voc Rehab treatment as necessary.

(Tr. at 67.)

On April 19, 1991, J. Alan Cochrane, M.D. interpreted an MRI
of Claimant's lumbar spine: "Normal bony vertebral alignment is
present.  The bony structures and intervertebral disc of normal
signal intensity.  No disc herniations are apparent.  The bony
spinal canal is normal diameter.  No intrathecal abnormality is
seen.  IMPRESSION: Normal MR of the lumbar spine." (Tr. at 135.)

Records indicate Claimant had twenty-five follow-up office visits at Huntington Internal Medicine Group from October 9, 1990 through November 7, 1995. (Tr. at 100-123, 216-21, 245-59.) Notes indicate Claimant was treated and received medication management for environmental allergies, seasonal allergies, external hemorrhoids, hypertension, high cholesterol, chest pain, tobacco addiction, sore throat, chronic bronchitis, osteoarthritis, depression, and back pain. (Id.)

In a noted dated August 15, 1991, Larry Perry, D. C. states that Claimant "has recovered sufficiently to be able to return to light work duties on 8-19-91." (Tr. at 178.)  Records indicate Claimant had one hundred forty-three chiropractic treatments with Dr. Perry from April 11, 1991 through March 20, 1997 for neck, low back and hip pain. (Tr. at 124-38, 172-80, 239-44, 304A-304B, 306, 448-50.)

On December 31, 1991, Jeffery L. Keys, D.C., reported that he had examined Claimant on October 15, 1991 regarding his April 9, 1991 Workers' Compensation injury, wherein he injured his lower back lifting on a tail gate of a dump truck. (Tr. at 54.)  Dr. Keys made this recommendation:

> An MRI was conducted on May 20, 1991 on Mr. Rice and it was found to be normal. This normal finding of the MRI indicates there was no herniated disc. However, the vertebral body can also irritate spinal nerve roots. Therefore, I feel that this man should be able to return to work within three (3) months as of the date of this report. It is my recommendation that Mr. Rice resume his chiropractic treatment from Dr. Larry Perry. I believe

9

consultation and evaluation by a neurosurgeon to explore surgical options would be of benefit.  Mr. Rice continues to be totally disabled.  At the end of three (3) months of chiropractic care with rehabilitative exercises instituted by Dr. Perry, the claimant should be re-examined and evaluated for any permanent impairment.

(Tr. at 55.)

On April 2, 1992, Panos Ignatiadis, M.D. examined Claimant for Larry Perry, D.C. regarding Claimant's April 9, 1991 Workers' Compensation injury.  His findings were:

> Physical Examination:  His cranials are intact.  His motor, sensory, and cerebellar testings were unrevealing. The reflexes are symmetric and equal.  There are no pathological reflexes. Mobility of the cervical, dorsal, and lumbar spine was full.
> X-Ray Examination: An MRI was negative.  X-rays of the lumbar spine were normal.
> Impression: At this stage I feel that he has fulfilled the maximum of medical improvement.  I don't feel that he exhibits any focal neurological deficit, and he does not require surgical intervention.  I feel he may be a candidate for rehabilitation.  To date he has been temporarily totally disabled.

(Tr. at 56.)

On October 13, 1992, Marj Weigel, physical therapist, reported that she had performed functional capacity testing on Claimant regarding his April 9, 1991 Workers' Compensation lumbar injury. (Tr. at 58-66.) Ms. Weigel wrote:

> X-rays and MRI performed on May 20, 1991 are negative for disc pathology.  Mr. Rice ruptured his biceps tendon in 1988, had it repaired in February 1989 and received physical therapy...returning to work in October 1989...During the course of the Functional Capacity Test, Mr. Rice also reported that he had a 20 year history of hemorrhoids which have become progressively worse over the past several years and have restricted his ability to squat, stoop or kneel...

10

Examination revealed a slight lateral shift to the left with all movement ranges of the low back to be within functional limits...

Mr. Rice's multiple complaints significantly affected his overall functional capabilities. Although he squatted fully 10 times during the musculoskeletal portion of the Functional Capacity Test, he refused to attempt to lift from floor to knuckle height due to an exacerbation of hemorrhoidal pain... His hemorrhoidal pain also limited his ability to lift more than 13 ½ pounds from 12" to knuckle height...

His functional limitations and exacerbation of pain indicate that he is functioning between the Sedentary and Sedentary Light category of work at this time... It seems that his hemorrhoidal problem is the most limiting factor in his physical rehabilitation efforts at this time. I feel that this issue should be addressed prior to initiating an exercise and work conditioning program in efforts to increase his current level of function to one that will allow him to be employable. I also feel that a 30 day free trial of a TENS unit may be appropriate to help this patient with his chronic low back pain.

(Tr. at 62-65.)

On August 3, 1993, Claimant was admitted to Cabell Huntington Hospital for hemorrhoids pain. (Tr. at 74-82.) Dr. John Hunt performed a hemorrhoidectomy on August 4, 1993, and Claimant was released to return home that evening. (Tr. at 74-77.)

On October 21, 1993, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work without visual, communicative, and environmental limitations. (Tr. at 83-89.) Claimant's manipulative abilities were unlimited with the exception of having limited ability to reach in all directions. (Tr. at 86.) Claimant was found to be able to do all postural positions frequently with

11

the exception that he could climb ladder/rope/scaffolds occasionally. (Tr. at 85.) The evaluator, L. Dale Simmons, M.D. noted that Claimant's MRI of his lumbar spine was negative and that his ruptured biceps tendon had been repaired. (Tr. at 84.)

On November 29, 1993, Jeffery L. Keys, D. C., was deposed in regard to Claimant's April 19, 1991 Workers' Compensation injury. (Tr. at 90-99.) He stated that he last evaluated Claimant on June 1, 1992 and wrote a report dated July 21, 1992. (Tr. at 93.) He opined that Claimant would not be able to return to his prior work with the West Virginia Department of Highways and did not think rehabilitation would be beneficial. (Tr. at 93, 97.) His diagnosis of Claimant was "spinal nerve root irritation without herniation." (Tr. at 95.)

On March 1, 1994, Larry D. Perry, D.C. completed a work-related activities form and opined that Claimant was limited in his physical functions, exertional, postural, and environmental activities due to "1. Torn biceps tendon, 2. Chronic myofascial pain syndrome lumbar spine." (Tr. at 124.)

On March 7, 1994, Charles Abraham, M.D. filled out a Workers' Compensation form stating that Claimant had hearing loss that "may be attributable and or aggravated by his noise exposure." (Tr. at 180A-B.)

On April 21, 1994, Mark Carter, M.D. evaluated Claimant for the West Virginia Disability Determination Service. (Tr. at 181-

85.)  Dr. Carter made these findings:

DIAGNOSTIC IMPRESSIONS:
1.   Patient history of hypertension.  Good control on
     current medications.  No evidence of end organ
     disease.
2.   Atypical chest pain.  Probable non-cardiac.  No
     history of exertional angina.
3.   Status post biceps tendon tear and repair in left
     arm 1988.  Some residual muscular loss but no
     significant impairment in terms of range of motion
     or strength.
4.   Low back pain.  No evidence of radiculopathy.  No
evidence of arthritis.

DISCUSSION:...
Mr. Rice does not appear to have any significant
impairment at this time.  Although he notes the problems
above and also has some problems with allergic rhinitis,
he does not appear to be severely impaired.  It appears
he would be able to tolerate light activity including
occasional bending to lift to carry light objects
appropriate for his age and size.  He had no
abnormalities in station or gait.  He had no abnormal
movements of his hands or upper extremities.  His speech,
vision and hearing appear to be within normal limits.

(Tr. at 184-85.)

On September 9, 1994, David Patick, M.D., Huntington Internal

Medicine Group, signed a form titled "Consolidated Public

Retirement Board Physician's Report" indicating that Claimant was

permanently unable to work due to "disabling osteoarthritis,

hypertension, lumbosacral pain, post traumatic left biceps injury."

(Tr. at 222.)

On December 5, 1994, Dr. Patick stated in a note: "To Whom It

May Concern: This note is to certify that Mr. Rice is totally and

permanently disabled since Nov. 11, 1991."  (Tr. at 139.)

In an undated form titled "West Virginia Public Employees

13

Retirement System Attending Physician's Statement of Disability,"
Dr. Patick stated that Claimant has "pain in muscles and joints"
and would be totally disabled for an "undetermined" amount of time.
(Tr. at 223-24.)

On December 27, 1994, Larry D. Perry, D.C. stated in a letter
to the Commissioner of West Virginia Workers' Compensation Fund
that he had been treating Claimant and opined that Claimant "is
permanently and totally disabled... due to the injuries received on
April 9, 1991." (Tr. at 215.)

On January 11, 1995, Joe A. Shy, D.O., Wayne County Family
Practice Associates, stated in a "To Whom It May Concern" letter
that he had examined Claimant regarding his April 11, 1991 Workers'
Compensation injury and concluded:

> IMPRESSIONS:
> 1.   Gentleman has chronic lumbar strain/sprain with
>      radiculopathy to the left lower extremity
> 2.   Status post rupture of the biceps tendon with
>      decreased strength and functional use of the left
>      upper extremity
> 3.   Diffuse complaint of arthralgia and osteoarthritis
>      by review of his records from other physicians
> 4.   Hypertension
> 5.   Mild anxiety disorder
>
> After examining the patient, reviewing minimal records
> from other physicians, and discussion with the patient,
> it is my opinion that the patient is unable to pursue his
> occupation as a heavy equipment operator...I feel that
> this patient is a poor candidate for rehabilitation or a
> re-training program.
>
> My final impression is that this gentleman is disabled
> and unable to return to his occupation as a heavy
> equipment operator.

(Tr. at 227.)

Notes dated February 28, 1995 through April 5, 1996 from Tri-State Otolaryngology indicate Claimant was treated for nasal congestion, headache, and post nasal drainage. (Tr. at 299-303.)

On March 1, 1995, Donald J. Woolwine, vocational expert [VE], testified at a hearing held before ALJ J. Alan Mackay. (Tr. at 360-65.) Claimant also testified and the VE was present during his testimony. (Tr. at 333-60.) Mr. Woolwine testified that he had reviewed the case file and listened to Claimant's testimony. (Tr. at 360.) The ALJ stated to the ALJ that he adopted the DDS finding that Claimant could not return to any of his past relevant work. (Id.) The ALJ then posed a hypothetical based on the medium physical RFC prepared for the DDS and asked the VE to give his "opinion with regard to the three exertional levels, medium, light and sedentary. As to the unskilled jobs noted by the secretary, what percentage in other words, of those jobs do you think he could be able to perform?" (Tr. at 361-62.) The VE responded: "There would be approximately 50 percent of the medium, and 90 percent of the light, and 95 percent of the sedentary." (Tr. at 362.) He went on to identify the medium jobs as hand packers and produce sorters; light jobs as office clerks and file clerks; and sedentary jobs as sorters, selectors, and inspectors. (Tr. at 362-63.) The ALJ then posed a second hypothetical based primarily on the sedentary physical RFC of Claimant's chiropractor, Dr. Perry. (Tr.

15

at 363.)   The VE responded that Claimant could do "approximately 15 to 20 percent of the sedentary." (Tr. at 364.)   When the ALJ asked "And would any of the examples you gave earlier, still be relevant, sorter, selectors, or inspectors?" (Id.)   The VE responded: "Yes, sir." (Id.)   In a third hypothetical, the ALJ asked "Finally, Mr. Woolwine, please make the assumption that complete credibility is accorded to the claimant's testimony, and it's supported by the medical evidence.   In your opinion on that assumption, would he be able to perform any of the unskilled jobs noted by the Secretary, at any of the exertional levels?" (Id.) The VE responded: "No, sir." (Id.)

On August 29, 1995, Claimant was treated at St. Mary's Hospital Emergency Department for chest pain of unknown etiology. (Tr. at 228-38.)

On December 29, 1995, Mohammed I. Ranavaya, M.D. completed a West Virginia Workers' Compensation Fund Physician's Report of Occupational Injury wherein he opined that Claimant had "been suffering from the disease of occupational pneumoconiosis...for the past few years" and had a 5% impairment.   (Tr. at 261.)

On April 3, 1996, Claimant was treated at St. Mary's Hospital on an outpatient basis for nasal obstruction.   (Tr. at 293-97.)   R. Arturo Roa, M.D. performed a "[n]asal septoplasty, bilateral, partial, inferior turbinectomy without fracture of turbinates, and cautery of turbinate edge."   (Tr. at 295.)

16

On June 14, 1996, Claimant's cervical spine MRI and brain MRI were interpreted by William S. Sheils, Jr., M.D.: "Minor focal central subligamentous HNP versus bulging disc at C6-7, which is of questionable significance. Correlation with neurological examination and history however is suggested to assess the significance of this finding... Normal MRI of the brain with mild sinusitis." (Tr. at 304.)

On July 30, 1996, Panos Ignatiadis, M.D. again evaluated Claimant per the request of Larry Perry, D.C. He stated:

> I think there are two problems here. One is the compensable injury which has led to his arm problem for which he has had surgery and has fulfilled the maximum of medical improvement. He also had a lumbar and cervical sprain, both of which do not require any medical intervention at this conjecture.

> However, the thing that bothers me particularly is that he has been on Lorcet for so long, and I think that has affected him mentally. I am sending a copy of this letter to his attending physician [Dr. Tom Dannals] to refer him to a psychiatrist, in order to come off the medication in a gradual way. Following that he should have a functional capacity assessment and possible work hardening program with the intent, through Vocational Rehabilitation, to establish any residual or capability of returning him to the working force.

(Tr. at 292A-292B, 298, 446-47.)

On July 1, 1997, R. Arturo Roa, M.D. stated in a general letter to the West Virginia Department of Highways Personnel Division:

> In reference to Mr. Rice, experience has been that he has some severe nasal allergies and nasal obstruction exacerbated by exposure to inhalant allergens, such as dust, pollen, and molds. He underwent nasal

17

> surgery...with a good result; however, he still has the
> underlying allergy problem.  He has seen Dr. Wilson for
> many years for allergy shots.  He has the specifics as
> far as sensitivities; however, I do concur that he
> clinically has allergic rhinitis syndrome.  There is no
> doubt that he would be at additional exposure if he had
> outdoor work, and I think that he should be restricted
> from exposure to anything that he may be allergic to.

(Tr. at 305.)

On May 31, 2000, Mark A. Carter, M.D., Story Consulting

Services, provided a consultative examination for the West Virginia

Division of Disability Determination.  (Tr. at 316-23.)  Dr. Carter

reached these conclusions:

> Mr. Rice is a 49-year-old individual with a history of
> left biceps tendon tear.  He underwent some surgical
> intervention but again tore the tendon postoperatively.
> He complains of residual weakness of the left biceps.  He
> is right-handed.  His physical exam revealed a surgical
> scar on the left biceps area.  He had some preserved
> strength but had an absent reflex and strength was graded
> at 4- to 3+/5.  The remainder of his muscle strength was
> normal.
>
> He has a history of hypertension and hyperlipidemia but
> is unaware of any cardiac disease, stroke or peripheral
> vascular disease.  His physical exam was remarkable for
> blood pressure at 160/100.  He was somewhat anxious.
> Heart was regular rate and rhythm without murmurs,
> gallops or rubs.  Peripheral pulses were normal.  Lung
> fields were clear.  No cyanosis, clubbing or edema.
>
> He complains of a history of low back pain with prior
> radiation of pain down the back of both legs to the
> heels.  He had a CT scan or myelogram that was normal and
> had no surgical intervention.  At time of exam, there was
> no point tenderness or spasm.  He had a normal station
> and gait.  Straight leg raises was negative and he could
> anterior flex 70 degrees.  Lower extremity strength and
> deep tendon reflexes were well preserved.
>
> He has a hard, fixed, bony deformity or nodule on his
> left ulnar styloid.  Range of motion of the wrist and

forearm function was intact.

He has a normal station and gait.  He had no abnormal
movements of his hands or upper extremities.  His speech,
vision and hearing appeared to be within acceptable
limits.

(Tr. at 318-19.)

On May 31, 2000, Dr. Carter also completed Form SSA-1151
"Medial Assessment of Ability to do Work-Related Activities
(Physical)" and concluded that claimant's lifting/carrying,
reaching, handling, and feeling were not affected by impairments.
(Tr. at 322-23.)  He found Claimant's pushing/pulling was limited
"to up to 25 pounds [due to the] biceps tendon tear post op
status." (Tr. at 323.) He found that Claimant had no environmental
restrictions caused by the impairment.  (Id.)

On June 13, 2000, a West Virginia Workers' Compensation Office
of Judges Decision awarded Claimant a Permanent Total Disability
"under the odd lot doctrine" with a disability onset date of
February 3, 1995, the date of the report of Claimant's attending
physician, Larry Perry, D.C.  (Tr. at 328-29.)

On January 24, 2001, Julius J. Barefoot, M.D., Story
Consulting Services, provided a consultative examination for the
West Virginia Division of Disability Determination.  (Tr. at 332C-
332L.)  Dr. Barefoot reached these conclusions:

This is a 50-year-old right-handed white male with a
history of hypertension for the past 30 years.  His blood
pressure today was noted to be well controlled at 120/84.
He does note a history of an apparent transient ischemic
attack in the past that was associated with a syncopal

19

episode six months ago.  He did have a head CT performed that apparently was unremarkable, however, he did fail to follow up with a neurologist as instructed.  He has no recurrence of syncope.  He has no history of arrhythmias.  He has no history of coronary artery disease.  He does note a history of hyperlipidemia, however, he reports that he was noncompliant on his medication because of his inability to purchase his medication.  He does have complaints of low back pain.  He has no complaints of pain that radiates into his legs.  He states he is able to walk for approximately 10 minutes on a flat level surface.  He does note a history of a previous operative procedure done on his left biceps that has left him with residual weakness in his left upper extremity.  He denies any focal sensory deficits in either his upper or his lower extremities.

This examinee is able to sit, stand, move about.  His ability to lift and carry heavy loads over extended periods with his left arm is impaired on the basis of his diminished strength in his left upper extremity that was graded at 4/5 on the left versus 5/5 on the right.  His grip strength was noted to be good bilaterally.  He has no complaints of any anginal type chest pain.  His gait was normal.  There was no evidence of any restrictions in his range of motion measurements involving his spine or extremities.  His ability to grossly manipulate objects and his grip strength was noted to be normal.  He is able to ambulate without the use of an assistive device.

(Tr. at 332E-332F.)

On January 24, 2001, Dr. Barefoot also completed Form SSA-1151 "Medial Assessment of Ability to do Work-Related Activities (Physical)" and concluded that due to Claimant's left biceps tendon repair he was limited in lifting/carrying to 10 to 15 pounds.  (Tr. at 332G.)  He found that Claimant's standing/walking, and sitting were not affected by impairment.  (Tr. at 332H.)  He concluded that Claimant could do all postural activities occasionally.  (Id.)  Claimant's physical functions were not unlimited, with the

20

exceptions of reaching and pushing/pulling. (Tr. at 332I.)
Claimant's environmental restrictions were heights, moving
machinery, temperature extremes, chemicals, dust, fumes, and
humidity. (Id.)

On February 20, 2001, Dr. Barefoot responded to the
interrogatory of ALJ Andrew J. Chwalibog: "Are lifting/carrying
affected by impairments?" Dr. Barefoot checked "YES." In response
to the question: "If "yes", how many pounds can the individual lift
and/or carry? Maximum occasionally (from very little up to 1/3 of
an 8-hour day)," Dr. Barefoot wrote: "15". (Tr. at 332M.) In
response to "Maximum frequently (from 1/3 to 2/3 of an 8-hour
day)," Dr. Barefoot wrote: "10". (Id.)

On April 2, 2001, Erwin R. Chillag, M.D. replied to the ALJ's
request for his professional opinion in connection with Claimant's
Social Security disability claim. (Tr. at 332O-332Q.) In response
to the interrogatory "What does the medical evidence establish that
the claimant's physical impairments are during the period from
April 19, 1991 up to December 31, 1996, Dr. Chillag responded: "1)
...left biceps...slight weakness with grip in left or non-dominant
hand 2) low back injury 4/9/91...normal neurological exam...normal
MRI of lumbar spine 3) alleged hypertension, controlled by
medication 4) overuse of narcotics 5) nasal obstruction, corrected
by surgery." (Tr. at 332P.) Dr. Chillag responded "No" to these
questions:

21

Did any of these impairments have the identical signs
and findings, demonstrated on examination and testing,
and at the same or greater level of severity, as are
listed in connection with any impairment listed in
Appendix 1, Subpart P, Regulations No. 4, i.e., in the
so called "Listings"? Did any of these impairments
"meet" such a Listing during this period?... Were any
one or more of these impairments, considered in
combination, of such a combined degree of severity as to
be the equivalent in severity of an impairment listed in
Appendix 1, Subpart P, Social Security Regulations No.
4, i.e., in the so-called "Listings"?  In other words,
did any one or more of these impairments equal such a
Listing during this period?

(Tr. at 332P-332Q.)

On April 11, 2001, Dr. Chillag submitted Form SSA-1151
"Medical Assessment of Ability to do Work-Related Activities
(Physical)" because he found Claimant's physical impairments did
not cause severe limitations during the period from April 9, 1991
up to December 31, 1996.  (Tr. at 332Q-T.)  He found Claimant was
limited to occasionally lifting/carrying 50 pounds, frequently
lifting/carrying 20 pounds, and to standing/walking about six hours
in an 8-hour day.  (Tr. at 332R.)   He concluded that Claimant's
sitting was not affected by impairment.  (Tr. at 332S.)  Claimant
was found able to do all postural activities frequently with the
exception that he could climb only occasionally.  (Id.) Dr. Chillag
opined that Claimant had no manipulative or visual/communicative
limitations.   (Tr. at  332T.)    Claimant's  environmental
restrictions were unlimited with the exceptions being to avoid
dust, fumes, odors, chemical, and gases.  (Id.)

22

Psychiatric Evidence

On April 29, 1994, Cynthia Clay, M.A., supervised psychologist, and Dale M. Rice, licensed psychologist, performed a psychological evaluation of Claimant for the Disability Determination Section of the West Virginia Division of Rehabilitation Services. (Tr. at 190-97.) The psychologists concluded that Claimant had good grooming, hygiene, eye contact, speech production, and alertness; normal gait, posture, concentration, attention, and pace; logical thought processes; average intellectual ability; recent and remote memories intact; immediate memory and abstract reasoning mildly impaired; and symptoms of depression and anxiety. (Tr. at 192-93.) Claimant obtained a Verbal IQ of 83, a Performance IQ of 81, and a Full Scale IQ of 82 on the WAIS-R, indicating upper borderline intellectual functioning. (Tr. at 193.) Claimant's daily activities included watching television, cooking, going to appointments, grocery shopping, eating out, visiting relatives, fishing, boating, collecting guns and driving. (Id.) Although he reported no close friends, the psychologists observed him to be "friendly and cooperative." (Id.) Their conclusions were:

DIAGNOSTIC IMPRESSION:

Axis I    296.21 Major Depression, Single Episode, Mild
          316.00 Psychological Factors Affecting
          Physical Condition
          305.00 Alcohol Abuse (by history)
          305.20 Cannabis Abuse (by history)
Axis II   V40.00 Borderline Intellectual Functioning

23

```
Axis III   By self report: left arm problems, back
           problems, allergies and hypertension
Axis IV    Severity of Psychosocial Stressors: 2-Mild
Axis V     Current GAF: 75; Highest GAF past year: 75
```

RECOMMENDATIONS

1.   Mr. Rice should be referred for psychiatric
     evaluation and follow-up psychotherapy and/or
     chemotherapy as indicated.
2.   Mr. Rice should be referred for a pain management
     evaluation and follow-up treatment if indicated.
3.   Mr. Rice should be referred for vocational
     evaluation and training... Mr. Rice appears
     competent to manage any benefits he might receive.

(Tr. at 195.)

On May 15, 1994, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 198-206.) The evaluator, Samuel Goots, Ph.D., found that Claimant's impairment was not severe – "major depression, single episode, mild." (Tr. at 198, 201.) Claimant had only slight limitation regarding restrictions of activities of daily living, maintaining social functioning, and seldom had deficiencies of concentration, persistence or pace, and had no episodes of decompensation. (Tr. at 205.)

Records indicate Claimant was a patient of Bill Webb, licensed social worker, Oasis Behavioral Health Services, from April 13, 1998 to July 1, 1998. (Tr. at 151-71, 315.) Although the handwritten notes are largely illegible, what is legible indicates that Claimant sought treatment for depression, sleep disturbances, and anger issues. (Tr. at 167-69.) Notes dated May 12, 1998 state

"I requested pt. [patient] remove all guns from his premises – he agreed." (Tr. at 160.)  Notes dated May 19, 1998, states: "Still depressed, very pessimistic future outlook.  He admits he used to have a very bad temper.  Caught up in the victim/sick role.  Not as open to options re: pain pills as he says he was a few sessions ago.  Probable analgesic abuse... Says he lives 'on caffeine, codeine, and nicotine.'" (Tr. at 158-59.)

Records indicate Claimant was evaluated by Daniel D. Cowell, M.D., University Psychiatric Associates, on May 28, 1998, and received five treatments and medication management on June 18, 1998, July 31, 1998, September 25, 1998, December 4, 1998, and January 21, 1999.  (Tr. at 141-48, 307-14.)  The May 28, 1998 report states that he provided a psychiatric evaluation of Claimant at the request of Mr. Webb of Oasis Behavioral Health Services.  The report states that when asked what his chief complaint is, Claimant stated: "Mr. Webb thinks my meds may be a problem." (Tr. at 146.)  Dr. Cowell found:

> MEDICAL HISTORY/PSYCHIATRIC: No prior history of diagnosis or treatment for mental disorder prior to the injuries in 1988 and 1991; no acknowledged symptoms either...On the Medical History Self Report, Mr. Rice checks virtually all items in every organ system...
>
> MENTAL STATUS EXAM: The patient walks into the interview with a limp and a plastic bag (filled with his medications) tied ostentatiously to his belt.  Eye contact is only occasional; recounting of the history appeared to be characterized by exaggeration and a dramatic flair... The patient's mood conveyed sadness.  Thought processes were characterized by circumstantiality, evasiveness, and tangentiality but no

25

looseness of association, pressure of speech, or flight
of ideas... Intellect is assessed as Low Average, though
no formal testing was done. He was oriented in all
spheres. Judgment was unimpaired; the patient had no
insight and could come up with no response to the
question of what he wished to "work on" in therapy
session. As he leaves the office, he mentions
(tearfully) that his best friend died within the past
year. He is waiting for his lawyers to "help me get a
job, an income of some kind."

DIAGNOSIS:
Axis I      1) Major Depressive Disorder - Mild/Moderate,
            non-psychotic, single episode
            2) Alcohol and possible Marijuana Abuse, by
            history
            3) Pain Disorder Associated with Psychological
            Factors
Axis II     Personality   Disorder,   NOS,   with mixed
            histrionic,   dependent,   passive-aggressive
            traits
Axis III    S/P   Occupational   injuries; hypertension;
            severe   allergies,   seasonal,   inhalant   and
            penicillin
Axis IV     Stressors include chronic pain, unemployment,
            uncertain future, current litigation, lack of
            an income, dependent living situation, recent
            significant loss
Axis V      GAF current: 50

FORMULATION: It is my sense that Mr. Rice is an
unreliable historian primarily because of his personal
style which tends toward a dramatic recounting of facts,
circumstantiality, and a certain amount of evasiveness.
It is hard to know just what to believe, or rather, what
significance to place on what one hears...Although he may
well have a chronic pain problem, what is needed in my
opinion is antidepressant treatment, not benzodiazepines
(Xanax) or Hydrocodone which may be worsening his
depression. If Mr. Rice is to meet the challenges
presented by his predicament he must be motivated to
consider what he will do with the rest of his life, and
commit himself to a trusting and supportive therapeutic
relationship. I think the focus of this treatment and
the success of its outcome will hinge largely on work on
Axis II psychopathology plus help from one of the SSRI's.
He needs to switch to decaffeinated beverages, eliminate
(or reduce his tobacco consumption - and the expense that

26

goes with it) and commit himself to a plan of positive
action, however small the steps may be.  I recommend he
gradually (very) be tapered off of his Xanax and
Hydrocodone (not at the same time), a move he will likely
resist.  Ultimately and not surprisingly, I'm afraid that
whatever improvement Mr. Rice achieves in his situation
will largely depend on himself.

(Tr. at 147-8.)

In a letter dated August 11, 1998, Dr. Cowell writes: "I agree

to accept Mr. Rice into treatment and he has had two appointments

(6/18 and 7/31/98).  I am tapering down his Xanax and Hydrocodone),

a course with which he has agreed...I plan on seeing him

infrequently (once per month to every other month) until we get

where we need to be."  (Tr. at 149, 309.)

Additional Evidence Solicited by the ALJ

On October 17, 2007, Ronald Kendrick, M.D. replied to the

ALJ's request for his professional opinion in connection with

Claimant's Social Security disability claim.  (Tr. at 451-54.) In

response to the interrogatory "What does the medical evidence

establish that the claimant's physical impairments are during the

period from April 19, 1991 up to December 31, 1996, Dr. Kendrick

responded: "a.  Low back pain of undetermined etiology - # 54 &

135; b.  S/P [status post] repair of ruptured left biceps tendon -

#50; c. Hypertension - #184; d. Environment allergies - #217." (Tr.

At 452.)  Dr. Kendrick responded "No" to these questions:

Did any of these impairments have the identical signs and
findings, demonstrated on examination and testing, and at
the same or greater level of severity, as are listed in
connection with any impairment listed in Appendix 1,

27

Subpart P, Regulations No. 4, i.e., in the so called
"Listings"? Did any of these impairments "meet" such a
Listing during this period?... Were any one or more of
these impairments, considered in combination, of such a
combined degree of severity as to be the equivalent in
severity of an impairment listed in Appendix 1, Subpart
P, Social Security Regulations No. 4, i.e., in the so-
called "Listings"?  In other words, did any one or more
of these impairments equal such a Listing during this
period?

(Tr. at 452-53.)

On October 17, 2007, Dr. Kendrick submitted Form SSA-1151
"Medical Assessment of Ability to do Work-Related Activities
(Physical)" because he found Claimant's physical impairments did
not cause severe limitations during the period from April 19, 1991
up to December 31, 1996.  (Tr. at 453-57.)  He found Claimant was
limited to lifting/carrying 15 pounds, and to standing/walking two
hours in an 8-hour day.  (Tr. at 455-56.)  He concluded that
Claimant's sitting was not affected by impairment.  (Tr. at 456.)
Claimant was found able to do all postural activities occasionally
with the exception that he could not balance.  (_Id_.) Dr. Kendrick
opined that Claimant's reaching, handling, feeling,
pushing/pulling, seeing, hearing, and speaking were not affected by
impairment.  (Tr. at 457.)  Claimant's environmental restrictions
were heights, moving machinery, temperature extremes, chemicals,
dust, fumes, and vibrations.  (_Id_.)

On December 3, 2007, Melissa Glannon, vocational expert [VE],
testified before ALJ Chwalibog.  (Tr. at 470-76.)  Ms. Glannon
responded to the ALJ's hypothetical: "Yes...such an individual

28

could perform sedentary jobs such as sedentary unskilled, bench work labor jobs, approximately 56,000 nationally, 4,900 in the region, sedentary, unskilled assembler jobs, approximately 54,000 nationally, 4,800 in the region, and sedentary unskilled surveillance system monitor jobs, approximately 70,000 nationally, 4,200 in the region." (Tr. at 474.) When Claimant's representatives added limitations, the VE responded: "Such an individual would be unable to perform light work, and would be able to perform approximately one percent of the sedentary jobs... Approximately 6,500 in the region." (Tr. at 475.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) it is unclear what records were considered in the ALJ Decision, and (2) the ALJ failed to weigh all the important medical evidence. (Pl.'s Br. at 12-17.)

The Commissioner argues that (1) the administrative record filed with the court on September 17, 2009 is a full and accurate transcript of the record of the proceedings in this case, and (2) substantial evidence supports the Commissioner's final decision that Claimant could perform a significant number of jobs that existed in the national economy during the relevant period of this case and, thus, was not disabled. (Def.'s Br. at 13-19.)

The Administrative Record

Plaintiff first argues that it is unclear what records were

29

considered in the ALJ Decision.  Specifically, Claimant asserts:

> The Commissioner has not made clear exactly what is in
> the record at the time the ALJ made his decision and when
> evidence was returned [to] the record after it was
> thought to be lost.  This file was lost and had to be
> reconstructed twice, once in 2000 and once in 2007.
> Apparently, as noted above, some of the exhibits
> previously thought lost were found again – at least in
> part - and returned to the record, although it is not
> clear when they were returned to the record or if they
> were considered in the final decision of the
> Commissioner, because the ALJ in the last decision did
> not mention many exhibits it is not clear if he may or
> may not have considered them.
>
> The Appeals Council stated in its Action dated March 24,
> 2007 that the original file had been lost, extensive
> efforts to reconstruct the file had not been successful.
> The February 12, 2002 ALJ decision had cited evidence as
> Exhibit 64.  The reconstructed file did not include
> Exhibits past Exhibit 59.  Thus it did not include the
> cited evidence. (TR 429) There was also a reference a to
> [sic] report from Jules Barefoot but the reconstructed
> file did not contain a report from Dr. Barefoot.  The
> decision also referred to evidence from a vocational
> expert citing certain specific jobs, but the file did not
> contain evidence from a vocational expert identifying
> those specific jobs.  The ALJ was ordered by the Appeals
> Council to update the evidence of record and determine
> whether the claimant was disabled.  (TR 429A)

(Pl.'s Br. at 12.)

The Commissioner responds that Claimant's first argument is

"confusing" and "has no merit." (Def.'s Br. at 13.) Specifically,

the Commissioner asserts:

> To the contrary, it is abundantly clear that the record
> during the proceedings relating to this case, which was
> the record that the ALJ repeatedly referred to in his
> decision, is the same record that was filed with the
> Court on September 17, 2009 (Docket No. 12; Tr. 403, 405,
> 408).  This fact is evidenced by the Certificate dated
> September 2, 2009, which was filed with the record and
> states in pertinent part:

> [T]he documents annexed hereto constitute a
> full and accurate transcript (except as
> designated on the Index herein) of the entire
> record of proceedings relating to this case.
> (Docket No. 12).

> The narrative of Plaintiff's argument irrelevantly
> focuses on the first two Appeals Council remand orders
> and the prior decision that the Appeals Council vacated
> on March 24, 2007 (Tr. 11-21, 423-29A; Pl. Br. at 12).
> However, none of these documents is pertinent to the
> Court's consideration of whether the Commissioner's final
> decision is supported by substantial evidence.
> Importantly, Plaintiff does not argue that the present
> record is incomplete, and he fails to articulate any
> specific deficiency, because none exists.

(Def.'s Br. at 14.)

It is noted that the March 24, 2007 Appeals Council mandate to

the ALJ was to

- Update the evidence of record to the extent required
  under 20 CFR 404.1512.1513. The ALJ will offer the
  claimant and his representative an opportunity to submit
  evidence relevant to the period at issue.
- Determine under sequential evaluation whether the
  claimant was disabled during the period at issue (20 CFR
  404.1520).

(Tr. at 429A.)

At the September 5, 2007 hearing, the ALJ discussed the case

and its record with Claimant and his representative, Rose A. Cyrus.

(Tr. at 465-69.) He stated:

> ALJ:      We're here today on a court remand in your
>           case. The decision initially made by Judge
>           Mackay back in 1996...it's been remanded
>           twice. All sorts of things have been lost.
>           We've had a conference with Miss Cyrus. I'm
>           going to give her three weeks. If you and she
>           can come up with any of the missing medical
>           records during that time spell, and then what
>           I will do is, I'll send this off to a medical

31

> > expert, hopefully we can resolve this one way
> > or another.  Do you understand that, sir?

> CLMT:      Yes, Your Honor.

> ALJ:       Do you have any questions about that?

> CLMT:      No, I do not.

(Tr. at 465.)

The ALJ and Claimant's representative then discussed with specificity the previous exhibit lists and compared it with the subject exhibit list, discussing missing exhibits.  (Tr. at 465-69.)  The hearing concluded with this exchange:

> ALJ:       Since we're doing this on the record, you can
> get me a copy of, of my old exhibit list [sic]
> are not missing documents, I give you three
> weeks, anything you can come up with, and then
> I'll try to send this off, we'll see what we
> can do.

> ATTY:      Okay.

> ALJ:       Does that sound reasonable?

> ATTY:      That sounds reasonable.

> ALJ:       Any other ideas?

> ATTY:      No.

> ALJ:       Do you agree it's an orthopedic problem --

> ATTY:      Yes, I definitely agree it's ... an orthopedic
> problem.

> ALJ:       Anything further?   Okay, I'll admit the
> exhibits that we have.  (Exhibits, previously
> identified, were received into evidence and
> made a part of the record thereof.)

> ALJ:       Anything further today, then?

32

ATTY:     Nothing as far as I'm concerned.
(Tr. at 468-69.)

The hearing transcript shows that Claimant and Claimant's representative participated fully in the process of obtaining records for the ALJ's review.  (Tr. at 465-69.)

Additionally, on October 22, 2007, the ALJ updated the evidence of record by requesting that Ronald E. Kendrick, M.D. review the record of this case and render his professional opinion regarding Claimant's disability.  (Tr. at 451.)  Dr. Kendrick reviewed the case file and completed interrogatories and a "Medical Assessment of Ability to do Work-Related Activities (Physical)" form. (Tr. at 252-62.)  Also, at a hearing held of December 3, 2007, the ALJ examined vocational expert Melissa Glannon regarding Claimant's vocational history and his current job availability. (Tr. at 470-76.)

With respect to Claimant's argument that it is unclear what records were considered in the ALJ Decision, the court proposes that the presiding District Judge **FIND** that the ALJ fulfilled the March 24, 2007 mandate of the Appeals Council to update the evidence of record, to offer the claimant and his representative an opportunity to submit evidence relevant to the period at issue, and to determine whether Claimant was disabled during the period at issue.  Claimant's argument focuses on the first two Appeals Council remand orders and the prior decision that the Appeals

33

Council vacated on March 24, 2007 (Tr. 11-21, 423-29A; Pl. Br. at 12; Def.'s Br. at 14).  Although the court acknowledges that it is unfortunate that Claimant's original claim file was lost, it appears that the reconstruction of the file was successful.  The vast majority of the documents, if not all, were recovered and reviewed, including the reports of Dr. Barefoot and the testimony of VE Donald J. Woolwine.  (Tr. at 332C-332N, 360-65.)  Further, these documents support that the Commissioner's final decision is supported by substantial evidence.

<u>Evaluation of All Evidence</u>

Plaintiff next argues that "the ALJ failed to weigh all the important medical evidence."  (Pl.'s Br. at 12.)  Specifically, Claimant asserts that the ALJ disregarded the March 1, 1994 opinion of Dr. Perry; the April 2, 1992 and July 30, 1996 opinions of Dr. Ignatiadis; the March 13, 1993 opinion of Dr. Carr; the November 29, 1993 opinion of Dr. Keys; the  July 1, 1997 letter of Dr. Roa; and the January 11, 1995 opinion of Dr. Shy.  (Pl.'s Br. at 12-17.)

The Commissioner responds that substantial evidence supports the ALJ's determination that Claimant could perform a significant number of jobs that existed in the national economy during the relevant period of this case, and thus, was not disabled.  (Def.'s Br. at 14.) Specifically, the Commissioner contends that none of the diagnostic and medical tests revealed any significant physical impairment: "[T]he ALJ was entitled to give little or no weight to

34

the opinions of chiropractors Perry and Keys and the physical therapist...neither a chiropractor nor a physical therapist is an acceptable medical source...20 C.F.R. §404.1513(a)... Dr. Ignatiadis' two examinations four years apart were unremarkable...Dr. Roa...letter is dated July 1, 1997...irrelevant to the ALJ's disability determination." (Pl.'s Br. at 16-20.)

Regarding the March 1, 1994 opinion of Dr. Perry (Tr. at 124-26), contrary to Claimant's assertion, the ALJ did not disregard his opinion. (Pl.'s Br. at 12-16.) Rather, the ALJ found that the chiropractor's assessment was not supported by the objective findings. (Tr. at 407.) Although Claimant takes issue with 20 C.F.R. §404.1513(a), a federal regulation that states that neither a chiropractor nor a physical therapist is an acceptable medical source, the ALJ generously made no reference to this regulation and fully considered Dr. Perry's opinion. Also, although Dr. Keys, a chiropractor, was not specifically mentioned in the ALJ's discussion, the limitations discussed by Dr. Keys in his November 29, 1993 deposition were obviously considered by the ALJ when he found Claimant's chronic lumbosacral strain to be a severe impairment and when he posed his hypotheticals to the VE. (Tr. at 90-99, 405, 408-09.)

The same is true of the March 13, 1993 report of Dr. Carr and the January 11, 1995 report of Dr. Shy stating that Claimant could not return to heavy labor work. (Tr. at 67, 225-27.) The ALJ did

35

not specifically mention these reports but he generously limited Claimant to unskilled sedentary work. (Tr. at 406-09.)

Regarding the April 2, 1992 and July 30, 1996 opinions of Dr. Ignatiadis, it is simply puzzling that Claimant would emphasize these reports, since neither is helpful to his claim. (Tr. at 56-57, 292A-B.) The first report states that Claimant's MRI was negative and x-rays of his lumbar spine were normal. (Tr. at 56.) In the second report, Dr. Ignatiadis states that Claimant's arm has been surgically repaired, that his lumbar and cervical sprains do not require any medical intervention, and that he feels Claimant is addicted to the narcotic Lorcet. (Tr. at 292B.) Still, it is important to note that the ALJ found Claimant's chronic lumbosacral strain and residuals from repair of a ruptured left biceps tendon to be severe impairments. (Tr. at 405.)

Again, although the July 1, 1997 letter of Dr. Roa was not specifically mentioned by the ALJ, he obviously considered it when he concluded that Claimant's environmental allergies were a severe impairment. (Tr. at 305, 405.)

The undersigned proposes that the presiding District Judge **FIND** that the ALJ did consider the "record as a whole" and did not discuss only selective evidence negative to Claimant, nor did the ALJ give more weight to certain evidence without stating any reason why it is more credible. Raney v. Barnhart, 396 F.3d 1007, 1009 (8th Cir. 2005) ("[Judicial] review of a decision of the

36

Commissioner . . . in a disability benefits case is limited to determining whether the Commissioner's decision is supported by substantial evidence on the record as a whole."). While not required to discuss every piece of evidence, an ALJ should discuss evidence that, if believed, could lead to a finding of disability. <u>Barrett v. Barnhart</u>, 355 F.3d 1065, 1068 (7th Cir. 2004); 20 C.F.R. § 404.1523 (2005); <u>Golembiewski v. Barnhart</u>, 322 F.3d 912, 918 (7th Cir. 2003) (per curiam); <u>Draper v. Barnhart</u>, 425 F.3d 1127, 1130 (8th Cir. 2005) (Determination of whether substantial evidence supports decision in social security disability case requires reviewing court to consider not only evidence in the record that supports Commissioner's determination, but also any evidence that detracts from that conclusion).

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F. 2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendations and to transmit a copy of the same to counsel of record.

August 26, 2010
        Date

                                    _Mary E. Stanley_
                                    Mary E. Stanley
                                    United States Magistrate Judge

38